Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is No. 171331, No. 171332, United States v. Doris Morel, and No. 171353, United States v. Erica Tomasino. Good morning, Your Honors. If I may, I'd like to reserve two minutes for a moment. Yes, you may. Thank you. Judith Meisner, representing Erica Tomasino. Ms. Tomasino was convicted of conspiracy to commit theft of government property, mail fraud, money laundering, and aggravated identity theft. She was also convicted of various substantive counts alleging those offenses. She received a 36-month sentence, a sentence of 12 months as to all the counts but the aggravated identity theft, which ran concurrent with each other, and then she received the mandatory consecutive 24-month or two-year sentence on the one count of aggravated identity theft. I'd like to address the aggravated identity theft conviction. Aggravated identity theft requires the government to prove that the defendant knowingly used, without lawful authority, the means of identification of another person during and in relation to an enumerated felony offense, and those felony offenses do include the theft of public money and mail fraud. The aggravated identity theft count in this case charged that on or about December 27, 2013, she committed the offense using a means of identification that were alleged were J.R.M.'s name and social security number. The initials were used throughout the trial. The full name was on the check. And this use was allegedly depositing a treasury check that was made payable to J.R.M. So those are the allegations. The evidence at trial showed that on December 27, 2013, Ms. Tomasino did deposit an endorsed treasury check issued to J.R.M. into an account of Rhode Island Produce, which was a company for which she did bookkeeping. The refund check was issued on December 2nd. There was no social security number on the check. There was a signature on the back, along with a stamp reading for deposit only Rhode Island Produce. There was no evidence as to who endorsed the check. The government's lead agent testified he didn't know who signed any of the checks. There was no evidence as to how Ms. Tomasino came into possession of this check. J.R.M. didn't testify. Now, the allegedly fraudulent tax return contained a social security number. It was e-filed by a tax preparer in New Jersey in November. And there was no evidence that Ms. Tomasino prepared or submitted or directed or participated in the submission of the tax return. But wasn't there evidence that there had been a deposit of many checks from Rhode Island with some similar addresses, and so that this was an ongoing activity, these check deposits, so that she would have to know that they were coming from somewhere, the same general area? Similar? I'm not quite sure what you're referring to in terms of similar addresses. Well, my understanding is there were a few addresses that these checks came from, and that she took them and knew that they were coming to the company and to her, and that she was depositing them on a relatively regular basis. There were three checks that were addressed to 50 Perry Street, where she lived. There were three. It's not clear which three those were. And we're here talking only about this one, this one check. And you say there was no evidence of where that check came from? Of where that check came from. Maybe, I think probably I'm oversimplifying this, but let me try it out on you. The point of the argument that you're making is that there is no evidence that she was really appropriating the persona of a real person. And isn't it the case that when one presents a check endorsed, that there is simply in terms of normal human behavior, an understood implication that the person presenting the check is either the living person who has endorsed it, or if there's a sex difference, the agent of a living person who has previously endorsed it, and for whom ultimately the person presenting the check is acting as sort of an agent to get it cashed in the normal course of the banking system, in the absence of which ultimately the person who endorsed it would end up being liable for the money that that person had received. So isn't there a clear implication that a living person has, I mean a real person, not a fictitious person, has in fact endorsed the check, and the person presenting it is using it as a means of identification either as the agent of that person or under the circumstance, some circumstances, the person himself. Is that argument too simple? Am I missing something? Well, Justice Souter, I think that there are a number of issues wrapped up in your presentation. There's what is a means of identification, what is a real person, real person and knowledge of real person, and also what is use. And in Borrella, this court rejected a broad definition of use and said that use for the purpose of this statute means that the defendant attempted to pass herself off as another person or was purporting to take some action on that person's behalf. Which is part of my hypothetical. There's certainly no evidence that she was passing herself off as J.R.M. And I don't think that depositing an endorsed check, and again, there's no evidence as to who endorsed it or whether she knew. But in the absence of some evidence to the contrary, isn't it reasonable and normal for a person receiving the check at the point of presentation to assume that there's a real person behind it who has made the endorsement? So isn't that a reasonable implication of the act of presenting it? That the person is a real person? That the person who endorsed it is a real person and that the individual presenting it in this case, for example, is presenting it ultimately as an agent of that person or the payee, if that isn't the same person, in order to ultimately to collect the money that will validate each of these steps in the transactions. But the person... You may answer. I apologize for the long question. If J.R.M. had endorsed the check and given it to someone to pay a debt, I don't believe that the person who is depositing it is acting as an agent of J.R.M. in that transaction. Why not? Because if the check is not paid on the assumption that the check and the endorsement is valid, then J.R.M. who gave it to the person presenting the check is going to be on the hook for the money. So anyone down the line, it seems to me, is acting as an agent ultimately to effectuate the transaction of having the payor end up paying. You are having the... Yes, the object is to have the payor pay the money, but whether for purposes of proof beyond a reasonable doubt of use of someone's... an indication that the person depositing it is necessarily acting on behalf of the person who endorsed the check. There's no evidence that anyone was going to transfer any money back to J.R.M. or that he was going to receive any benefits from that transaction. Ms. Villa. May it please the court. I am Virginia Villa on behalf of Doris Morel. The government gave an explanation as to why it struck J.R.M. 15, and in my brief, I neglected to set forth the entire conversation that followed the presentation of that reason. And that occurs on the sealed appendix at 8 to 9 and then 10. And what happened is that the government mentioned that... I'm sorry, did you notify the government that you were going to make this argument having withheld it from the brief? It's part of the record, Your Honor. It's just a supplemental and pointing out part of the record. I'm not certain this is entirely proper, but proceed. It is part of the ruling, and so that the government said he had socialized, which I did put in my brief. And the court says, I do recall him bringing that. I don't think when you say socialized, and it's in quotations, and Mr. McAdams said he said he chatted with them, was friendly with them. The court said, I thought in a sense, as any customer, I want the record to be clear, but I thought it was in connection with him shopping, Mr. McAdams. I think that's correct, the court. He exchanged pleasantries with the individuals. And then the court said, all right, considering the reasons given by the government, and this is in my brief, for the strike, I'm going to overrule the Batson challenge. And so he then steps forth, as in my brief, that the Batson challenge was based on exclusively his having, juror number 15, having been in the Dominican market. The reason that the exclusion of part of the government's rationale, which I did also argue in my brief, that was rejected at the time that the court ruled on this, was that socializing was not necessarily what could be inferred from juror number 15's statements in court. And that the government had mischaracterized that, but the court was aware of that mischaracterization when it ruled on the objection. Well, wasn't it enough that the government's explanation, at least as I understood it from reading the record, that he was in the neighborhood, this was going, he did frequent the store on occasion, that his mother was a customer of the store, and it was all going to be about what occurred in that store. Isn't that a reasonable enough position on the government's part, given the fact that an African American juror actually was chosen and sat through the trial? No, your honor. Why not? And the reason is materiality. And so that in all of the cases cited by the government in its brief, there was something about being able to accurately evaluate bias. Whether a juror would favor one party over another for some outside reason from the evidence presented in court. In this case, the government was going to present all the types of evidence that juror number 15 would have had knowledge of the layout of the inside of the store, the way that the store looked on the outside. Anything that that juror would have had knowledge of was not material to any bias or potential bias by that juror, and that information was going to be presented in the courtroom. And so that's the major difference between familiarity with the actual location, but not familiar with any of the evidence that consisted of the crime. Because simple familiarity with a physical space wasn't going to inform that juror any more or any less than any other juror as to the actions that occurred within that physical space that constituted the crime. And so the question is, is the materiality of the rationale to why that person is struck? And so that then the court starts looking at the totality of the circumstances as to why that person was struck, and that's where you get into the question of, if the court at the time that was ruling on this thought that the government was overstating its case of bias, as to a minority and a member of a suspect class, that court should have at that point sustained the objection and sat juror number 15. The fact that afterwards the government did not also strike a person who would have had outside knowledge due to language abilities adds to that conclusion. But everything that the judge needed to know about that strike, he knew at the time that he denied the strike. And so I believe that based on this record, at the time the objection was made, the judge should have ruled differently. And you didn't make a specific objection, as I understand it. You are now claiming that there was a general objection in the court that viewed the two defendants similarly. That is correct. Because they were exactly similar. Was there an agreement reached at the beginning of trial that if one defendant made an objection, it served for both defendants? Your Honor, they were picking this jury together. Answer my question. Yes or no. Was there such an agreement? There was not an overt agreement. It was implied in the fact that they were picking the jury together, Your Honor. Implied is not a response to my question. All right. Thank you. Good morning, Donald. Lockhart for the government. Unless the court has a different preference, I'll start with the aggravated identity theft issues and then turn to the defense. That's fine. I have a question for you to begin. Perhaps it's arcane, but it's my understanding that the UCC is in effect in Rhode Island. Is that not correct? That I can't say for sure. Well, when I look at the check, the check is actually a bearer check. Because the endorsement is above the stamp. And if I remember the UCC correctly, in order to have a special endorsement, the stamp would have to be first and then the endorsement. So the fact that the endorsement is above the stamp doesn't tell me who endorsed the check, does it? I don't really follow you. I think as a practical matter. Well, I'm talking about is this a bearer check or is this a check with a special endorsement? And it depends on how it was actually endorsed in the check. And I've looked at the check. And the check is signed first and then the stamp for deposit is below it. And if my memory of the UCC is correct, in order to have a special endorsement, the stamp would have to be above the signature. And so that doesn't tell me who signed the check. Well, this is the first time I've heard that distinction. So I'm just not prepared to answer the UCC distinction that you're raising. I'm not familiar with it. And it certainly wasn't mentioned in the district court or in the briefing. I understand that. But I think it's sort of an interesting question as to what the check was. And so there was no evidence, as I understand it, as to who signed the check. Well, no. The strong circumstantial evidence is that we – so the check is on page 17 of the governance addendum. There's a nice reproduction of it on that page. If you want to look at the check, that's where it is, page 17. If you look at the back of the check, you see what we say is the forged signature of Joelle Ramon Mercado above the stamp that you were talking about. Now, there is strong circumstantial evidence that Tomasino herself likely forged that signature on the check. But that's not dispositive of the issue because the issue here, Judge, is that the statute simply requires a means of identification. That's the threshold question, is do we have a means of identification and do we have use? Now, on the means of identification front, the statute says all we need is any name alone or in conjunction with other information that identifies a specific individual. Now, this is a U.S. Treasury tax refund check. You see right in the middle of the check toward the bottom, it's not just U.S. Treasury, but it says right on it, tax refund check. The evidence at trial shows that these checks, the tax refund checks, are only issued to real, specific people who hold specific Social Security numbers. So this is a check to not just any old Joelle Ramon Mercado, but to a very specific Joelle Ramon Mercado. And when Luce Tomasino takes this check to the bank and presents it to the teller, there is the implicit message that Joelle Ramon Mercado has endorsed over this check. He wants me to have the value of this check. Well, that gets into Justice Souter's earlier question that he raised. I'm going now from means of identification to use. The means of identification is we have a very specific Joelle Ramon Mercado in compliance with the statute because this is not just his signature on a blank sheet of paper or even on an ordinary check. This is what purports to be his signature on a U.S. Treasury tax refund check that can only be issued to that specific Joelle Ramon Mercado. So that's your means of identification. And the use comes into play when she conveys that implicit message, purports to act on behalf of Joelle Ramon Mercado by taking the check to the bank, presenting it to the teller. And the implicit message of that is Joelle Ramon Mercado, the original payee of this check, the one to whom the money should go, wants me to have it. And that's why you can see his endorsement right there on the back of the check. In my perspective, it doesn't matter whether it's above or below the stamp. It still contains that implicit message. Well, if it was reversed, it would be pretty clear that she or someone on her behalf had actually put his signature on the check. I accept your argument for what it is, but what is the evidence that she was the endorser of the check? Well, the circumstantial evidence that Tom Asino was the one who made the forged endorsement comes from the fact that, number one, she is depositing this check into her own account. This is her own account. Number two, the evidence from one of the government's witnesses was that she herself would fill out the deposit materials for these tax refund checks before they would go to the bank. Sometimes she would have this guy named Harold Sanabria make the deposits for her, but he testified, Sanabria testified, that he would watch her as she filled out the deposit materials, including the slip and everything else. Was there any testimony that he saw her actually sign the checks? Not this particular check, and neither did he testify that he saw her endorsing checks. I want to be clear about that. But he did say that he saw her filling out the deposit materials, and we know that this is a forged signature from other evidence. The question is, who forged it? From our perspective, it doesn't matter whether she did or whether a confederate did, because the implicit message on the endorsement is the same, whether she forged it or whether somebody else in her group forged it. But, yes, there is circumstantial evidence that she is the one who would have done it. She's depositing it into her account. Is there any handwriting expert evidence? There was some handwriting that came into play, not in terms of this endorsement, but in terms of she has some telltale ways of making certain characters when she filled out the deposit materials, so that you can see even in situations where Harold Sanabria was the one who made the deposit, the deposit materials still bear some sort of telltale characters that you can associate with Tomasino. Having said that, we did not have a signature person come in and say that these endorsements or this particular endorsement was in her handwriting. So the case for her having done the endorsement herself, in this case, for Joelle Ramon Mercado, is circumstantial, but again, it's not necessary to pin her to the act of the endorsement, because the key thing is that even if somebody else in the group forged his name on the back of the check, there is still use when she presents that check to the teller, for the reasons that I've already mentioned. The other thing I want to note in connection with the use argument is that when you look back at the Baroah case, the facts of Baroah are just so strikingly different from the kind of facts that we have in this case. With some very unusual facts, you had two doctors who were writing prescriptions for patients, and the patients were well aware that their names were being used on these prescriptions. In fact, the patients were taking the prescriptions to get them filled, so the doctors were filling out the names and addresses of patients on these scripts, and the only thing that was even fraudulent about the transactions was that the doctors had cheated on their medical exams, and they had bogus MDs, and therefore they shouldn't have been writing the prescriptions in the first place. And so in that case, the idea that the identities of these patients, who knew very well that they were getting these scripts, were stolen was kind of strange right from the get-go, which kind of explains why Baroah came out as it did in that case. Here we have a situation which is, from our perspective, classic identity theft. You have people who are taking the names and socials of real people, using them on tax returns to get fraudulent tax refund checks, and this check deposit stage of the transaction, where Tomasino is most identified with, is the culmination of a much broader scheme that clearly is right within the heartland of what the statute is meant to address. These check deposits are really the culmination of an overall identity theft, and we certainly have the means of identification on the one hand, we also have the use, we also have, we haven't addressed it yet, we have a real person, we have a real Joel Ramon Mercado, there's no doubt that that person from the evidence was a real person, and for a number of reasons, we showed circumstantially that Tomasino knew he was a real person. So these, from our perspective, are the elements for that offense, and we met them. Unless the court has further questions on the aggravated identity theft issue, I'll turn briefly to the Batson claim. There are a number of threshold procedural issues with this Batson issue. You don't need to address those issues because there are really three problems on the merits, and I want to focus on the merits. Actually, don't we have the issue of whether an objection was made and whether we have plain error review? Well, as I just said, there are three procedural threshold issues I don't think you need to address because the merits are so easy, but I'll address the three threshold problems. The first is that Morell's counsel did not join in the Batson claim. All the talking was done by Tomasino's attorney. There is no evidence in the record of any sort of agreement, whether by the court or between counsel, that an objection by one would count for an objection by all. There's a second procedural problem which applies to both defendants, Tomasino and Morell, and that is Morell's attorney, when making the Batson claim, acknowledged right in making the objection that there could very well be a reasonable explanation for the striking of Juror 15. And then we gave that reason to the court, and in the aftermath of that, defense counsel said absolutely nothing, had no rejoinder at all to our race-neutral explanation. From our perspective, the defendant has to, the case law is clear, the defendant bears the burden throughout the inquiry. The defendant dropped the ball at that point. If we give a race-neutral explanation, and the defendant acknowledges at the start that there may be a reasonable explanation, and then there's silence after that, that is not carrying the Batson burden. And then there's a final third procedural problem, a little bit more exotic, because only the Second Circuit has apparently addressed the issue, but neither defendant appealed the magistrate judge's Batson ruling to the district court. There are a number of ways to argue that issue from both sides. We don't think the court needs to address that issue. It's not one of Article III subject matter jurisdictions, so under the Steel Company decision of the Supreme Court, you could bypass the question of whether parties need to appeal to the district court from magistrate judge's Batson rulings. But we did want to at least put a place marker in on that issue to alert the court to it. Now on the merits, there are really a couple problems. Number one, the threshold position of the defense that we struck the only black member of the panel is just wrong. As we know from the augmented record in this case, there was a second black panel member, a woman, she served through the verdict. So we did not strike the lone black member of the panel. Second, even if we had struck the lone black member of the panel, that would not have enabled the defendant to satisfy even his prima facie Batson burden. The case law of this circuit, including Burgador and two other cases, Gray v. Brady and Scott v. Gelb, all cited in our brief, make plain to us anyway that that is not enough for the defense to satisfy the prima facie burden. But the most dispositive thing on the merits is that we have a finding, not clearly erroneous, of the magistrate judge that our race neutral explanation was valid. And remember, we have this scheme that emanates from the Dominican market. We have a juror who says he frequented that store, he's familiar with the owners, he's friendly with the owners, he talks with them. One of the owners is, the main owner, is co-defendant Vasquez. He's the lead defendant in the indictment. Two of the defendants, the ones on appeal, worked at that store for years. A government witness also worked at the Dominican market. This is the epicenter of our fraud scheme. And so we were concerned, as our response in the district court made clear, that this would color the juror's view of the case potentially. And that was a valid race neutral explanation. Thank you. Thank you. Ms. Meisner. In terms of the endorsement on the check, there was no evidence that Ms. Tomasino endorsed that check. The evidence was that no one knew. It could have been J.R.M. for all the evidence established. The account into which it was deposited was not her personal account. It was the business account of a company for which she did bookkeeping. And then she took it from that account, did she not, and put it into the market account? Wasn't there some... I don't believe there was any evidence as to where this check went, other than it was deposited into the Rhode Island Produce account. And Rhode Island Produce was a company in Rhode Island that sold fruits and vegetables to other companies, and she did bookkeeping for that company. So there is no evidence that she signed that check. Was there any common ownership with that company and the market? No, there was not. The government says it doesn't matter who endorsed the check as long as she is the one who deposited it and she had adequate knowledge that it had to be a forged signature. So what's your response to that? That there is not evidence that she had adequate knowledge that it was forged. There was no evidence at all as to who had signed it. It could have been J.R.M. I'm sorry, are you being responsive to my question? The government says it really doesn't matter. It does matter because whether a name is a means of identification, the government is leaping from name to forged signature. Some courts have said a forged signature is enough, other courts have not, and here the only means of identification alleged was a name, not a forged signature, and there was no evidence it was a forged signature. Okay, thank you.